UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLCO RENEWABLE ENERGY LIMITED, <br><br>　　　　Plaintiff, <br><br>v. <br><br>MASSACHUSETTS ELECTRIC COMPANY D/B/A NATIONAL GRID, and ANGELA O'CONNOR, JOLETTE WESTBROOK and ROBERT HAYDEN, in their individual capacity and in their official capacity as Commissioners of the Massachusetts Department of Public Utilities, and JUDITH JUDSON, in her individual capacity and in her official capacity as Commissioner of the Massachusetts Department of Energy Resources, <br><br>　　　　Defendants. | Case No. <br><br>COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE SUPREMACY AND DORMANT COMMERCE CLAUSES OF THE UNITED STATES CONSTITUTION, THE FEDERAL POWER ACT AND THE PUBLIC UTILITY REGULATORY POLICIES ACT |

NATURE OF THE ACTION

　　1.　　This complaint seeks declaratory and injunctive relief against the Commissioners of the Massachusetts Department of Public Utilities and the Commissioner of the Massachusetts Department of Energy Resources (the "Commissioners") for the State of Massachusetts' facial discrimination against out-of-region renewable energy generators, such as Plaintiff, in violation of the dormant Commerce Clause.

　　2.　　This complaint also seeks damages from the Massachusetts Electric Company ("National Grid") and the Commissioners for their respective roles in violating the Plaintiff's rights under the Federal Power Act ("FPA") and the Public Utility Regulatory Policies Act ("PURPA")[1] to sell energy and capacity to National Grid under a long-term contract.

---

[1] 16 U.S.C. § 824a-3.

3. The first action involves the State of Massachusetts' treatment of renewable energy credits from certain out-of-state renewable electric generating facilities. Like all electric generating facilities, renewable energy facilities generate electricity. However, the environmental attributes from generating electricity using renewable resources are separately represented by what are called renewable energy credits (or "RECs"). For each one megawatt-hour of electricity generated, a renewable energy facility generates one REC. RECs are separate items of property and can be traded and sold separately from the electricity generated by the renewable energy generator. Certain States, of which Massachusetts is one, require their utilities to acquire a certain amount of RECs each year, or pay a penalty if the required number of RECs is not acquired. Massachusetts, however, only allows RECs from certain States or Canadian provinces to qualify toward a utility's obligations. For example, a REC from a generator in one of the New England States automatically qualifies in Massachusetts, a REC from a generator in Quebec or New York can qualify in Massachusetts, but a REC from a generator in every other State cannot.

4. The dormant Commerce Clause prohibits a State from using its regulatory power to discriminate against out-of-state businesses.

5. Massachusetts' ban on certain out-of-state RECs facially discriminates, and also has the effect of discriminating, against Plaintiff's out-of-state renewable energy facilities in violation of the dormant Commerce Clause. This action seeks declaratory and injunctive relief that would allow RECs from any renewable energy generator in the United States to qualify as RECs in Massachusetts.

6. The second action relates to National Grid's ongoing refusal to agree (and the Commissioners role therein) to purchase energy and capacity from a group of Plaintiff's solar projects at the long-term rate required under Section 210 of PURPA (*see*, 18 C.F.R. § 292.304(d)(d)(ii)).

7.  In the FPA, Congress occupied the field of wholesale sales of electricity. 16 U.S.C. § 824(b)(1).  Thus, States may not enter that field of regulation.  In section 210 of PURPA, Congress subsequently carved out a role for States to regulate wholesale sales by Qualifying Facilities (or "QFs")[2] in order to encourage the development of renewable energy generation and to reduce reliance on fossil fuels.  It did so by imposing an obligation on electric utilities, like Defendant National Grid, to purchase electricity at wholesale from QFs. Congress also called upon state regulatory commissions, like the Massachusetts Department of Public Utilities ("DPU"), to implement federal regulations for the electric utilities under their jurisdiction.

8.  National Grid has refused and continues to refuse to purchase energy and capacity from a group of Plaintiff's solar projects at the long-term rate required under Section 210 of PURPA.  National Grid has based its refusal upon a regulation issued by the Commissioners.  That regulation is pre-empted by the FPA, PURPA and is invalid under the Supremacy Clause of the United States Constitution.

## PARTIES

9.  Plaintiff Allco Renewable Energy Limited ("Plaintiff" or "Allco") is the owner and developer of the QFs in Massachusetts, as well as QFs in Georgia, New York and other States.  *See,* Section 3(17) of the FPA, 16 U.S.C. §796(17).  Plaintiff is a "qualifying small power producer" within the meaning of 16 U.S.C. §796(17)(D).

10.  Defendant Massachusetts Electric Company d/b/a National Grid is a Massachusetts electric company, pursuant to M.G.L. c. 164, §1, with a principal place of business in Waltham, Massachusetts.

---

[2] A cogeneration facility produces both electric energy and steam or some other form of useful energy, such as heat. 16 U.S.C. § 796(18)(A). A small power production facility uses biomass, waste, or renewable resources (such as wind, water, or solar energy) to produce no more than 80 megawatts of electric power. 16 U.S.C. § 796(17)(A).  These two categories of generators are QFs.

11. Defendant Angela M. O'Connor is Chairperson of the DPU, and is sued in her individual and official capacities.

12. Defendant Jolette Westbrook is a Commissioner of the DPU, and is sued in her individual and official capacities.

13. Defendant Robert Hayden is a Commissioner of the DPU, and is sued in his individual and official capacities.

14. Defendant Judith Jordon is the Commissioner of the Massachusetts Department of Energy Resources, and is sued in her individual and official capacities.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action brings claims arising under federal law.

16. This Court has subject matter jurisdiction over this action pursuant to 16 U.S.C. § 825p because it brings claim under the FPA.

17. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 on the grounds of diversity of citizenship as the amount in controversy exceeds $75,000.

18. This Court is empowered to grant declaratory relief by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

19. This Court is empowered to grant preliminary and permanent injunctive relief by, *inter alia*, 28 U.S.C § 2202; Rule 65 of the Federal Rules of Civil Procedure; and *Ex Parte Young*, 209 U.S. 123 (1908).

20. This Court has personal jurisdiction over the individual Defendants because each such Defendant conducts a substantial portion of his or her duties as in the District of Massachusetts.

21. This Court has personal jurisdiction over Defendant National Grid because it conducts its business, and is headquartered, in the District of Massachusetts, at 40 Sylvan Avenue, Waltham, Massachusetts.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in the District of Massachusetts.

## LEGAL BACKGROUND

*Bans on out-of-state products.*

23. Bans against the products of other States (which Allco's out-of-region RECs are) are one of the evils the Commerce Clause was intended to address. The dormant Commerce Clause "strikes at one of the chief evils that led to the adoption of the Constitution, namely, state tariffs and other laws that burdened interstate commerce." *Maryland v. Wynne*, 135 S. Ct. 1787, 1794 (2015).

24. The Commerce Clause grants Congress power to "regulate Commerce . . . among the several States." Art. I, § 8, cl. 3.

25. A State "may not, under the guise of exerting its police powers … make discriminations against the products and industries of some of the States in favor of the products and industries of its own or of other States." *Brimmer v. Rebman*, 138 U.S. 78, 82 (1891).  It is inconsistent with the concept of the federal Union for a State to establish a preferential trade region and regulate a vital portion of interstate commerce under a discriminatory regime that boycotts disfavored states.

*Massachusetts' Renewable Portfolio Standard*

26. Massachusetts has established a renewable portfolio standard ("RPS")(*see* M.G.L. c.25A, § 11F, 225 CMR 14.00 *et seq.*) that requires Massachusetts retail distribution utilities ("Massachusetts Utilities") to have a certain percentage of their electricity mix be attributable to renewable energy sources. In 2015, that percentage is 10% for Class I RECs increasing to 15% by 2020.

27. The RPS requirement can be satisfied by a Massachusetts Utility owning renewable generation, entering into a power purchase agreement to acquire renewable energy and the associated RECs, or by the acquisition of RECs alone.

28. 225 CMR 14.00 *et seq.* creates two general types of RECs that qualify for Massachusetts' RPS, and thus qualify as Massachusetts RECs.

29. The first type of qualifying Massachusetts RECs are for energy produced by a renewable energy generating unit that is located within the ISO-New England control area (i.e., Connecticut, Massachusetts, Vermont, New Hampshire, Rhode Island and most of Maine). This type of REC only requires that the generator be located in the ISO-New England control area.

30. The second class of qualifying Massachusetts RECs are for energy produced by a renewable energy generating unit that is located within a control area that is adjacent to the ISO-New England control area. The control areas adjacent to ISO-New England are ISO-New York, the area in Northern Maine administered by the Northern Maine Independent System Administrator, Inc. ("NMISA"), and Quebec and New Brunswick in Canada. However, RECs related to energy produced from those adjacent areas only qualify as Massachusetts RECs if one other significant condition is satisfied: that the generator obtain potentially costly transmission rights to transmit the energy to ISO-New England for consumption within ISO-New England.

31. RECs from generating facilities located in States outside of ISO-New England or an adjacent control area are banned and thus do not qualify as Massachusetts RECs under any conditions.

*FERC's exclusive jurisdiction to regulate wholesale transactions*

32. The FPA gives the Federal Energy Regulatory Commission (the "FERC") exclusive jurisdiction to regulate all wholesale sales of electricity. *See, FPC v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964) (Congress left "no power in the states to regulate … sales for resale in interstate commerce.").

33. Exercising its jurisdiction under the FPA, the FERC has determined that a multistate, market-based system of setting wholesale electricity prices will lead to the most efficient allocation of generating resources by favoring efficient generators and disfavoring inefficient ones. In New England, the FERC has implemented that policy by authorizing wholesale electricity sales through a multistate market operated by an entity called ISO-New England, a FERC-regulated Independent System Operator.  ISO-New England operates an energy market, in which generators compete to sell electricity by submitting "bids" in real time.  ISO-New England matches supply and demand on a continuing basis, and, using a FERC-approved auction process, determines the market price for electricity based on the bid of the least costly generation resource needed for supply to match demand.  This method is intended to result in the operation of the most efficient set of generation resources at any particular point in time.  Generators also sell electricity to wholesale buyers in freely negotiated, voluntary bilateral contracts, pursuant to FERC-approved market-based tariffs.

*PURPA's must-buy obligation on electric utilities.*

34. Congress enacted PURPA to address the conditions in the electricity market that evolved since the passage of title II of the FPA in 1935.  In Title II of PURPA, Congress amended the FPA and enacted Section 210 of PURPA in order to create a new class of "favored cogeneration and small power facilities" in the overall regulatory scheme of the Nation's energy markets.

35. Allco, as a favored QF under PURPA, is *precisely* the type of plaintiff Congress intended to benefit when it created the new class of market participant in the Nation's energy markets.

36. Prior to the enactment of PURPA, small renewable energy generators had difficulty finding buyers for their output because electric utilities were reluctant to purchase power from non-traditional generation facilities.  PURPA

addressed that problem by *requiring* electric utilities to purchase power generated by QFs, 16 U.S.C. § 824a-3(a), and subsequently creating a federal right to have the costs of such purchases recovered by utilities in retail rates. 16 U.S.C. § 824a-3(m)(7).

37. Pursuant to PURPA's directive, FERC provided in its regulations that "[e]ach electric utility shall purchase … any energy and capacity which is made available from a qualifying facility … [d]irectly to the electric utility." 18 C.F.R. § 292.303(a).

38. PURPA also directed FERC to promulgate rules ensuring that "in requiring any electric utility to offer to purchase electric energy from any … qualifying small power production facility, the rates for such purchase" shall not "exceed[] the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a-3(b). Under federal regulations, an electric utility must purchase *any* electricity made available to it by a qualifying facility, such as Plaintiff's solar projects. An electric utility also must pay a particular price for those purchases: the utility's "avoided costs," that is, the amount the utility otherwise would have spent to buy or produce the electricity that it is required to purchase from the qualifying facility.

39. Although the utility's avoided costs may be greater than the qualified facility's costs of production, Congress and FERC determined that allowing qualified facilities to receive the benefit of that difference would further the statutory purpose, by providing economic incentives to increase renewable energy production and improve efficiency. Consumers, meanwhile, would be left no worse off.

40. Federal regulations further provide that the utilities' avoided costs are to be calculated using two different methodologies. The first methodology determines the utility's avoided costs at the moment electricity is actually delivered to the utility – often calculated on a month-to-month basis, based on

fluctuating market prices for natural gas or coal. The second methodology determines the utility's projected avoided costs over the length of the entire contract with the QF, calculated at the time the contract is entered. That second method provides a QF with greater certainty concerning its revenues over the length of its contract with the utility. Federal regulations require that the QF be able to choose the pricing methodology it prefers over the contract term offered by the QF.

41. While States have some flexibility in devising programs to implement the federal statute and regulations, they still must act within the boundaries of federal law. Thus, States may not exempt their utilities from the obligation to purchase renewable power under Section 210 of PURPA. Nor may States refuse to offer renewable generators the ability to choose between the two pricing methodologies set forth in the federal regulations, and such State action would be doubly preempted:  it would not only conflict with PURPA, but would also fall within the field of wholesale electricity rate-setting, which, except for PURPA, Congress has reserved exclusively for FERC.

42. The FERC's rules issued under PURPA Section 210(a) are enforceable under the FPA. *See*, 16 U.S.C. § 824a-3(h)(1).

43. Similarly, States may not discriminate against QFs. 16 U.S.C. §§824d, 824e. Thus a determination by the DPU of what costs a utility would avoid by purchasing from a renewable energy generator must be applied on a non-discriminatory basis for the benefit of all similarly situated renewable energy generators.

*<u>Massachusetts prohibition of the rate required by 18 C.F.R. § 292.304(d)(d)(ii).</u>*

44. 220 C.M.R. §8.05(2)(a) prohibits electric utilities from purchasing energy and capacity at the long-run rate mandated by federal law in 18 C.F.R. § 292.304(d)(d)(ii).

9

## FACTS APPLICABLE TO ALL COUNTS

45. Allco has RECs to sell to the Massachusetts Utilities from a QF located in the State of Georgia. Massachusetts law has banned those RECs from qualification in the State of Massachusetts.

46. Allco is also the owner of a QF in New York, an ISO-New England adjacent control area, which will generate RECs. But that QF will not deliver its electricity to the ISO-New England control area because of the additional cost burdens involved in doing so. Massachusetts law has banned those RECs from qualification in the State of Connecticut.

47. On March 28, 2011, Allco submitted an offer to sell the entire generation output from various QFs to National Grid under PURPA.

48. Allco's proposal was for multiple solar photovoltaic projects in various locations throughout Massachusetts.

49. After more than 90 days had passed without an agreement on terms, on August 3, 2011, Allco filed a complaint against National Grid with the DPU (the "DPU Complaint") requesting that the DPU investigate the reasonableness of National Grid's actions, and issue an order declaring that (i) a legally enforceable obligation existed between Allco and National Grid in respect of each of the QFs, (ii) the energy purchase rate would be based on National Grid's avoided costs over the specified term of 25 years calculated at the time the obligation was incurred (i.e., March 28, 2011), and (iii) those costs would be based upon the avoided costs of National Grid that the DPU had then recently calculated in *Petition of Massachusetts Electric Company and Nantucket Electric Company each d/b/a National Grid for Approval of Proposed Long-Term Contracts for Renewable Energy with Cape Wind Associates, LLC Pursuant to St.2008, c. 169, § 83,* D.P.U. Docket 10-54, *Order* (November 22, 2010)("*MEC*").

50. In *MEC*, the DPU was determined what would be the costs that National Grid would avoid by entering into a contract with the renewable energy generator known as Cape Wind. The determination of the future costs that would be avoided by National Grid was needed in order for the DPU to determine if the proposed contract was cost-effective. The proposed contract would only be able to be considered cost-effective if the costs that National Grid would avoid by entering into the contract would exceed the purchase rates that National Grid would pay to Cape Wind. The DPU extensively analyzed the costs that would be avoided by National Grid from the proposed contract and concluded that the costs that National Grid would avoid were well in excess of the proposed contract per megawatt-hour energy price.

51. Plaintiff's renewable energy QFs are similarly situated to Cape Wind in that they would result in National Grid realizing substantially the same avoided costs. The DPU's findings in *MEC* is exactly the type of projected avoided cost determination that results in the purchase rates required under federal regulations, 18 C.F.R. §292.304(d)(2)(ii).

52. The DPU cannot ignore its own findings in determining the avoided cost rate under PURPA.

53. In response to the complaint, National Grid filed a motion to dismiss in which it conceded that a legally enforceable obligation existed as of March 28, 2011, between the Allco and National Grid. Despite that admission, National Grid argued that it was prohibited by DPU regulations from paying anything other than the spot market ISO-New England rate as such rate is determined from time to time by DPU regulation, 220 C.M.R. §8.03(1)(b).

54. Because National Grid has admitted that a legally enforceable obligation exists, the remaining two issues were (i) the purchase rate and term, and (ii) whether the National Grid was prohibited from paying anything other than the spot market ISO-New England rate as it claimed. In its offer to National Grid, Allco

selected the avoided costs calculated at the time the obligation is incurred over a specified term of 25 years. *See,* 18 C.F.R. §292.304(d).

55. On July 22, 2014, nearly three years after filing of the DPU Complaint (during which time the DPU just sat on it and basically did nothing), the DPU issued the Final Order dismissing the DPU Complaint.

56. The Final Order confirmed that a legally enforceable obligation exists between Allco and National Grid in respect of each QF but holds that under 220 C.M.R. §8.05(2)(a) purchases from QFs can only be at the short-run as-available rate, and not calculated at the time the obligation is incurred over the specified term offered by the QF.  Because the Final Order determined that there was no obligation to determine long-term avoided costs, determining those costs based upon the evidence and record in *MEC* was moot.

57. On August 11, 2014, Allco appealed the DPU's order to the Massachusetts Supreme Judicial Court for Suffolk County, where it is currently pending.

## CLAIM FOR RELIEF

## COUNT I

### VIOLATION OF THE DORMANT COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION

58. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 57 as though fully set forth herein.

59. Under the dormant Commerce Clause, state action is illegal if it either facially discriminates against out-of-state businesses or has the purpose or the effect of discriminating against out-of-state businesses.  Here, Massachusetts' action does both.

60. Massachusetts' prohibition on Allco's out-of-region RECs is not closely tailored to achieve any legitimate local purpose. Nor does the prohibition provide for

putative local benefits to Massachusetts that outweigh the burdens on interstate commerce.

61. Bans against the products of other States (which Allco's out-of-region RECs are) are one of the evils the Commerce Clause was intended to address. A State "may not, under the guise of exerting its police powers … make discriminations against the products and industries of some of the States in favor of the products and industries of its own or of other States." *Brimmer v. Rebman*, 138 U.S. 78, 82 (1891).

62. The Commerce Clause prohibits the "economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325-326 (1979). Balkanization, however, is exactly what Massachusetts' policy advocates.

63. Creating economic regions among States that would band together and prohibit commerce, ban products or impose tariffs on commerce from States outside the region is equally offensive to the economic balkanization that the Commerce Clause was intended to prohibit.

64. While it may be convenient for the State of Massachusetts to rely on the ISO-New England accounting system for RECs, there are many other equally verifiable REC tracking systems throughout the United States.

65. Massachusetts' ban on RECs outside the ISO-New England region is simply regional protectionism. Plaintiff suffers, and will continue to suffer, injury because the Plaintiff is denied the ability to sell the RECs from its Georgia and New York facilities to the Massachusetts Utilities and have those RECs qualify to meet the Massachusetts Utilities' RPS requirements.

66. But for Defendants' facial discrimination, Plaintiff would be able to sell the RECs from its Georgia and New York facilities to the Massachusetts Utilities and have those RECs qualify to meet the Massachusetts Utilities' RPS requirements.

67. Allco is also unjustifiably disadvantaged in comparison to other REC sellers who are similarly situated by the existence of Massachusetts' ban.

68. Plaintiff has no adequate remedy at law and no opportunity for compensation for Defendants' violations of the dormant Commerce Clause.

69. Plaintiff will suffer irreparable harm by the violation of the dormant Commerce Clause, and the balance of harms favors Plaintiff, because Plaintiff will suffer substantial economic losses, but the State Defendants in their official capacities are immune from suit for retrospective relief.

70. Because the prohibition on out-of-region RECs is the result of the Defendants' and the State of Massachusetts' use of its regulatory power to facially discriminate against certain out-of-state sellers of RECs, the State of Massachusetts' prohibition of those RECs must be set aside as inconsistent with the dormant Commerce Clause.

## COUNT II

## VIOLATION OF THE FEDERAL POWER ACT AND THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION

71. Plaintiff restates and incorporates by reference each and every allegation in Paragraphs 1 through 70 as if fully set forth herein.

72. Under the Supremacy Clause of the United States Constitution, a state law is preempted when Congress intends federal law to occupy the field, as well as in cases where the state law conflicts with federal statutes or regulations, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

73. DPU regulation 220 C.M.R. §8.03, as confirmed in the Final Order, is inconsistent with FERC's regulations under PURPA, because prohibits the long-run forecasted rate required by 18 C.F.R. § 292.304(d)(2)(ii). Thus it conflicts with federal regulations, and is preempted and void *ab initio*.

74. Moreover, because the DPU regulation is not authorized by PURPA, it falls outside the narrow exception that Congress has given to States to regulate wholesale electricity sales. Except for the authority granted by PURPA, States are without power to set rates, terms or practices for wholesale electricity sales; such fields, with the exception of actions that are consistent with PURPA, are reserved exclusively for FERC. For that reason, too, the DPU regulation is preempted.

## COUNT III

## CLAIM FOR DAMAGES AGAINST NATIONAL GRID

75. Plaintiff restates and incorporates by reference each and every allegation in Paragraphs 1 through 74 as if fully set forth herein.

76. Federal law imposes upon National Grid an obligation to purchase any and all energy and capacity offered to it by Plaintiff's QFs. National Grid acknowledges that obligation but had refused and continues to refuse to purchase such energy and capacity at the long-term forecasted rate required by federal law from Allco's QFs.

77. In *MEC*, National Grid advocated for, and the DPU made findings with respect to, the forecasted long-term costs that would be avoided by National Grid by the interconnection of a renewable generator.

78. National Grid's refusal to purchase the energy and capacity at the long-term forecasted rate required by federal law from Plaintiff's QFs violates its obligations imposed under federal law.

79. National Grid has breached and repudiated its obligations imposed by federal law.

80. As the result of National Grid's actions, the Plaintiff has suffered damages due to the loss of income and profit that it would have received if National Grid had not breached and repudiated its obligations imposed by federal law.

## COUNT IV

## VIOLATION OF 42 U.S.C. §1983

COMPLAINT

81. Plaintiff restates and incorporates by reference each and every allegation in Paragraphs 1 through 80 as if fully set forth herein.

82. Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

83. 42 U.S.C. § 1983 affords remedies for deprivation of "rights" under statutes as well as the Constitution, provided that Congress has not foreclosed such an enforcement in the statute itself.

84. This case is a classic example of state actors that through neglect and listless oversight have allowed and continue to allow National Grid to perpetrate injury and ignore federal law.  Both National Grid and the DPU are aware that their actions violate federal law.  DPU's neglect and listless oversight is clearly evident by the fact that the DPU took no action on Plaintiff's claims for more than two years and then refused to take action.

85. Plaintiff as developer and owner of QFs has specific protected interests as a Congressionally-created participant in the Nation's energy markets.  Congress created QFs specifically so they could replace non-QF generation in the Nation's energy markets.

86. PURPA clearly focuses on small and nontraditional energy supplying facilities, who hence are intended beneficiaries thereof.

87. The Defendants' actions directly harm Allco and its QFs by eliminating the benefit of their special status as Congressionally-favored market participants and their clear federal right to sell their energy and capacity at a long-term forecasted rate.

88. Allco is clearly an "intended beneficiary of a statutory scheme that prevents governmental interference [which] gives it rights enforceable against governmental interference in an action under § 1983." *See, Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

(1) That the Court find and declare as follows:

    a. Massachusetts' ban on the Plaintiff's out-of-region RECs which prohibits those RECs from qualifying for the Massachusetts RPS violates the dormant Commerce Clause of the United States Constitution and is void, and

    b. the DPU's regulations and orders eliminating and/or interfering with the Plaintiff's rights to sell energy and capacity at a long-term forecasted rate violate Section 210 of PURPA and the FPA, and are void *ab initio*;

(2) That this Court enjoin the Defendants from taking further action discriminating against out-of-region RECs;

(3) That this Court enjoin the Defendants from taking further action inconsistent with the entitlement of a QF to a long-term forecasted rate;

(4) That this Court find and declare that the avoided costs determined by the Defendants in *MEC* be used to calculate the long-term forecasted rate to which Plaintiff's QFs are entitled to be paid by National Grid;

(5) That this Court award damages to Plaintiff in an amount that reflects the net income that Plaintiff would have received using the power purchase agreement rates from *MEC*;

(6) That this Court award Plaintiff damages and their reasonable attorneys' fees to the extent allowable under 42 U.S.C. §§ 1983 and 1988 against all Defendants; and

(7) That Plaintiff be granted such other further relief as the Court may deem just and proper.

Dated: October 6, 2015

      /s/ Thomas Melone
Thomas Melone (*pro hac vice pending*)
ALLCO RENEWABLE ENERGY LIMITED
77 Water St., 8th Floor
New York, NY 10005
Telephone: (212) 681-1120
Facsimile: (801) 858-8818
Thomas.Melone@AllcoUS.com

*Attorneys for Plaintiff*