**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                              )
ALLCO RENEWABLE ENERGY LIMITED,  )
                              )
              Plaintiff,       )
                              )
v.                            )
                              )
MASSACHUSETTS ELECTRIC COMPANY  )
D/B/A NATIONAL GRID; ANGELA     )
O'CONNOR, JOLETTE WESTBROOK and )      Civil Action
ROBERT HAYDEN, in their official )     No. 15-13515-PBS
capacities as Commissioners of the )
Massachusetts Department of Public )
Utilities; and JUDITH JUDSON, in )
her official capacity as        )
Commissioner of the Massachusetts )
Department of Energy Resources,  )
                              )
              Defendants.      )
_____)
```

**MEMORANDUM AND ORDER**

September 23, 2016

Saris, C.J.

**INTRODUCTION**

Allco Renewable Energy Limited ("Allco") filed this suit against Massachusetts Electric Company, doing business as National Grid, and various Massachusetts public officials ("state defendants"), seeking redress for alleged violations of the Public Utility Regulatory Policies Act ("PURPA"). Allco claims that National Grid violated PURPA by refusing to enter into a long-term contract to purchase electric energy from

Allco's solar energy projects at a specified rate (Count III). Allco also claims that the Massachusetts Department of Public Utilities ("MDPU") regulations that National Grid cited as the basis for its refusal, 220 Mass. Code Regs. §§ 8.03, 8.05, are inconsistent with PURPA and therefore invalid (Count II).

National Grid moved to dismiss Count III of the complaint. Allco moved for summary judgment on Counts II and III, and the state defendants cross-motioned for judgment on the pleadings on Count II. National Grid's motion to dismiss Count III of the complaint (Docket No. 27) is **ALLOWED**. Allco's motion for summary judgment (Docket No. 50) is **DENIED** as to Count III and **ALLOWED** as to Count II. The state defendants' cross-motion for judgment on the pleadings on Count II (Docket No. 63) is **DENIED**.

**BACKGROUND**

I.    **Statutory and Regulatory Framework**[1]

Congress enacted PURPA in 1978 to combat an energy crisis by reducing the nation's dependence on traditional fossil fuels. FERC v. Mississippi, 456 U.S. 742, 745–46 (1982). Section 210 of PURPA sought to accomplish that goal by encouraging the development of nontraditional electricity generating facilities, such as those that use renewable resources. See 16 U.S.C.

---

[1]    This Court relies extensively on the Brief of Amicus Curiae Federal Energy Regulatory Commission ("FERC"), which explains the relevant statutory and regulatory background. FERC declined to take a position on the merits of the pending motions.

§ 824a-3; see also FERC, 456 U.S. at 750 & n.11; Am. Paper
Inst., Inc. v. Am. Elec. Power Serv. Corp., 461 U.S. 402, 404-05
& n.1 (1983).

Congress found that one obstacle to the development of
alternative energy projects was the reluctance of traditional
electric utilities to do business with such projects. FERC, 456
U.S. at 750 & n.12. As such, PURPA directed the Federal Energy
Regulatory Commission ("FERC") to promulgate rules requiring
utilities to purchase electric energy from qualifying facilities
("QFs").[2] 16 U.S.C. § 824a-3(a).

Under PURPA, those required electric energy purchases must
be at rates that do not "exceed[] the incremental cost to the
electric utility of alternative electric energy." Id. § 824a-
3(b). That incremental cost is "the cost to the electric utility
of the electric energy which, but for the purchase from [the
QF], such utility would generate or purchase from another
source." Id. § 824a-3(d). That cost is also known as "avoided
cost." 18 C.F.R. § 292.101(b)(6).

In accordance with PURPA, FERC promulgated rules requiring
electric utilities to purchase energy from QFs at a rate equal
to the utility's full avoided cost. Id. § 292.303(a) (purchase

---

[2]     Whether an energy provider is a QF is determined under 16
U.S.C. § 796(17)(C) and (18)(B), as well as 18 C.F.R.
§§ 292.101(b)(1) and 292.203.

obligation); id. § 292.304(a)(2), (b) (avoided cost); Am. Paper Inst., 461 U.S. at 406. The FERC rules give each QF two options for how to provide energy to utilities:

> Each qualifying facility shall have the option either:
>
> > (1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or
> >
> > (2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:
> >
> > > (i) The avoided costs calculated at the time of delivery; or
> > >
> > > (ii) The avoided costs calculated at the time the obligation is incurred.

18 C.F.R. § 292.304(d).

State regulatory commissions, in turn, are directed by section 210(f) of PURPA to implement FERC's rules. 16 U.S.C. § 824a-3(f)(1); FERC, 456 U.S. at 751. Under PURPA's statutory scheme, "the states play the primary role in calculating avoided costs and in overseeing the contractual relationship between QFs and utilities operating under the regulations promulgated by [FERC]." Indep. Energy Producers Ass'n, Inc. v. Cal. Pub. Utils. Comm'n, 36 F.3d 848, 856 (9th Cir. 1994). States have "latitude

4

in determining the manner in which the regulations are to be implemented" and can choose to meet their mandate "by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules." FERC, 456 U.S. at 751.

Massachusetts fulfilled its mandate via MDPU regulations codified at 220 Mass. Code Regs. ch. 8.00. Under the MDPU regulations, a QF may sell to a utility either under "[a] standard contract available to all [QFs] for sales at the Short-run Rate only," or under "[a] negotiated contract executed by a [QF] and a [utility]." 220 Mass. Code Regs. § 8.03(1)(b). The short-run rate is the "hourly market clearing price for energy and the monthly market clearing price for capacity, as determined by" ISO New England, Inc., a FERC-regulated regional transmission organization that operates the wholesale power grid for New England states. Id. § 8.02.

The MDPU regulations also provide standard terms of purchase for QFs, grouped by their capacity. Id. § 8.05. QFs with a design capacity of one megawatt or greater "shall have their output metered and purchased at rates equal to the payments received by the [utility] from the ISO power exchange for such output for the hours in which the [QF] generated electricity in excess of its requirements." Id. § 8.05(2)(a). In other words, the MDPU regulations define the avoided cost rate

for QFs with a design capacity of one megawatt or greater --
such as Allco's QFs -- as the spot market ISO New England rate.

## II.  **Factual Background**

Allco is the owner and developer of solar generation QFs in
Massachusetts and a number of other states. National Grid is a
Massachusetts electric utility company.

On March 28, 2011, Allco submitted an offer to sell the
entire generation output from several solar energy generating
QFs in Massachusetts[3] to National Grid for a term of twenty-five
years. Allco offered to negotiate a purchase agreement under 220
Mass. Code Regs. § 8.03(1)(b)(2) and proposed two pricing
options.

On April 18, 2011, National Grid declined to negotiate a
purchase agreement but instead offered to purchase Allco's
energy under National Grid's standard power purchase contract,
with the rate as set out in National Grid's MDPU-approved
Qualifying Facility Power Purchase Rate P Tariff ("P-Rate
Tariff"). In accord with 220 Mass. Code Regs. § 8.05(2)(a), the
P-Rate Tariff states that "QFs that have a design capacity of 1
[megawatt] or greater shall have their output metered and
purchased at rates equal to the payments received by [National

---

[3]    Each of the eleven QFs listed in Allco's offer letter had a
capacity of greater than one megawatt and less than thirty
megawatts.

Grid] from the ISO power exchange for such output for the hours in which the QF generated electricity in excess of its requirements."

On August 3, 2011, Allco filed a petition under 220 Mass. Code Regs. § 8.03(1)(c) requesting that the MDPU investigate the reasonableness of National Grid's response. Allco asked the MDPU for a declaration that (1) National Grid has a legally enforceable obligation to purchase from each of Allco's QFs; (2) the purchase rate should be based on National Grid's avoided costs over the twenty-five-year term, calculated at the time the obligation was incurred; and (3) National Grid's avoided costs for that time period should be based on a rate forecasting methodology used in a specific prior MDPU proceeding.

On July 22, 2014, the MDPU denied Allco's petition for an investigation, finding National Grid's offer to Allco to have been reasonable and consistent with MDPU regulations.[4]

Allco filed a petition for review of the MDPU's decision with the Massachusetts Supreme Judicial Court. That action

---

[4]     Previously, on August 1, 2011, Allco had filed a separate petition with the MDPU under 220 Mass. Code Regs. § 2.03 to amend the MDPU regulations to create new long-term rates payable to renewable energy QFs. The MDPU had denied that petition on December 23, 2011 on the basis that the MDPU regulations were consistent with federal and state requirements.

remains pending. Allco Renewable Energy Ltd. v. Dept. of Public Utils., No. SJ-2014-0337 (Mass. filed Aug. 11, 2014).

On July 28, 2014, Allco filed a petition with FERC to initiate an enforcement action against the MDPU on the basis that the MDPU regulations were inconsistent with PURPA. See 16 U.S.C. § 824a-3(h)(2)(B).

On September 26, 2014, FERC issued a notice of intent not to act on Allco's petition. Allco Renewable Energy Ltd. Ecos Energy, LLC, 148 FERC ¶ 61,233 (2014). Under PURPA, FERC's decision not to initiate an enforcement action against the MDPU allowed Allco to bring this suit against the MDPU. See 16 U.S.C. § 824a-3(h)(2)(B).

On October 6, 2015, Allco initiated this suit. The operative complaint is the first amended complaint, filed on February 11, 2016. Allco seeks a declaration that the MDPU regulations are invalid (Count II) as well as a declaration that National Grid has a legally enforceable obligation to purchase energy and capacity from Allco's QFs for twenty-five years at a forecasted avoided cost rate (Count III).[5] Allco also seeks damages from National Grid for income that Allco's QFs would

---

[5]    Count I, which is not at issue here, alleges that Massachusetts discriminated against out-of-state renewable energy generators in violation of the dormant Commerce Clause.

have received for sale of electric energy at the long-term forecasted avoided cost rate (Count III).

On February 18, 2016, National Grid moved to dismiss Count III of the complaint for failure to state a claim. On April 20, 2016, this Court held a hearing on the motion and took the motion under advisement.

On May 4, 2016, Allco moved for summary judgment on Counts II and III. On June 27, 2016, the state defendants filed a cross-motion for judgment on the pleadings on Count II. The Court heard argument on these motions on July 14, 2016 and took the motions under advisement.

## DISCUSSION

### I.   National Grid's Motion to Dismiss

#### A.   Legal Standard

A Rule 12(b)(6) motion is used to dismiss complaints that do not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In evaluating a Rule 12(b)(6) motion, this Court must accept the factual allegations in Allco's amended complaint as true, construe reasonable inferences in its favor, and "determine whether the factual allegations in the plaintiff's complaint set forth 'a plausible claim upon which relief may be granted.'" Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014) (quoting Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 353 (1st Cir. 2013)).

**B.    Federal Cause of Action Against National Grid**

Count III of Allco's complaint seeks damages and declaratory relief against National Grid for its failure to enter into a long-term contract to purchase electric energy. National Grid moves to dismiss on the basis that PURPA does not provide Allco with a private cause of action against National Grid. National Grid also argues that it met all of its legal obligations by offering to purchase electric energy from Allco at the MDPU-approved spot market rate.

Allco responds that National Grid's compliance with the MDPU regulations is insufficient where the MDPU regulations are inconsistent with federal law. Allco argues that notwithstanding the MDPU regulations, National Grid has a direct obligation under federal law to purchase energy at the long-run forecasted rate.

Allco is correct that FERC's implementing regulations obligate electric utilities like National Grid to purchase electric energy from QFs. 18 C.F.R. § 292.303(a) ("Each electric utility <u>shall</u> purchase . . . any energy and capacity which is made available from a qualifying facility." (emphasis added)); <u>Am. Paper Inst.</u>, 461 U.S. at 404-06; <u>see also</u> FERC Amicus Brief, Docket No. 58 at 4 (describing how "PURPA charges [FERC] with implementing mandatory purchase and sell obligations" on electric utilities).

But Allco misses the next step. Allco expends a lot of
energy arguing that this purchase obligation is a "direct
obligation" imposed by federal law that becomes effective
without any further implementation by a state regulatory
authority. But the relevant question is not whether the purchase
obligation is "direct." Instead, the question that would have
been spot on is whether that obligation is enforceable through a
private cause of action against the electric utility. See
Alexander v. Sandoval, 532 U.S. 275, 286 (2001) ("[P]rivate
rights of action to enforce federal law must be created by
Congress. The judicial task is to interpret the statute Congress
has passed to determine whether it displays an intent to create
not just a private right but also a private remedy.").

The answer, based on the PURPA statutory scheme, is no.
PURPA's judicial review and enforcement procedures are contained
in section 210(g) and (h). Together, these subsections comprise
"an overlapping scheme of federal and state judicial review of
state regulatory action taken pursuant to PURPA." Greenwood ex
rel. Estate of Greenwood v. N.H. Pub. Utils. Comm'n, 527 F.3d 8,
10 n.1 (1st Cir. 2008); see also Power Res. Grp., Inc. v. Pub.
Util. Comm'n of Tex., 422 F.3d 231, 234–35 (5th Cir. 2005).

Under section 210(h)(2)(A), FERC can bring an enforcement
action to enforce section 210(f)'s requirement that states must
implement FERC's PURPA rules. 16 U.S.C. § 824a-3(h)(2)(A); see

11

also Indus. Cogenerators v. FERC, 47 F.3d 1231, 1234 (D.C. Cir. 1995). Under section 210(h)(2)(B), an appropriate private party may petition FERC to bring such an enforcement action against a state and, if FERC declines to do so, the private party can bring its own enforcement action in federal court. 16 U.S.C. § 824a-3(h)(2)(B); see also Indus. Cogenerators, 47 F.3d at 1234.

Under section 210(g)(2), any person can bring an action in state court against an electric utility to enforce any requirement established by a state pursuant to section 210(f). 16 U.S.C. § 824a-3(g)(2) (incorporating 16 U.S.C. § 2633).

The resulting scheme is one that differentiates between "implementation" claims and "as-applied" claims. See Exelon Wind 1, LLC v. Nelson, 766 F.3d 380, 388 (5th Cir. 2014); Power Res. Grp., 422 F.3d at 235-36; Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978, 23 FERC ¶ 61,304, 61,645 (May 31, 1983). An implementation claim is a claim that a state agency has failed to implement FERC's PURPA regulations or has implemented them in a way that is inconsistent with FERC's regulations. Power Res. Grp., 422 F.3d at 235. Such claims are brought in federal court by FERC or a private party against the state agency under section 210(h)(2). Id. Meanwhile, an as-applied claim challenges the application of a state agency's

12

rules to an individual petitioner. Id. Such claims are reserved to the state courts. Id.; Mass. Inst. of Tech. v. Mass. Dep't of Pub. Utils., 941 F. Supp. 233, 236-37 (D. Mass. 1996).

Allco argues that the MDPU regulations are an unlawful implementation of the FERC regulations under PURPA and attempts to enforce the purchase obligation in the FERC regulations directly against National Grid. What Allco is seeking, however, does not fit the mold of any of the enforcement mechanisms provided by PURPA. Section 210(g)(2) does not apply because Allco is not suing to enforce a state regulation, but rather to challenge the state regulation itself. An action to enforce a state regulation would have to be brought in state court anyway. Section 210(h)(2)(B), however, only allows a private party to challenge the validity of a state implementation by bringing an implementation claim against the applicable state regulatory authority, not against an electric utility. See 16 U.S.C. § 824a-3(h)(2)(B). Allco cites no case finding a private cause of action for a QF to enforce the FERC regulations' purchase obligation directly against a utility in federal court.

Rather, an examination of the statutory scheme shows that PURPA's enforcement mechanism relies on a state's implementation of PURPA under section 210(f). Allco's remedy for the MDPU's allegedly improper implementation of the FERC regulations is an implementation claim against the MDPU and, once the FERC

13

regulations are properly implemented by the state, an as-applied claim against the utility to enforce the state implementation. The statute does not provide Allco with an additional federal damages or declaratory relief remedy against National Grid. See Sandoval, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); see also Bonano v. E. Caribbean Airline Corp., 365 F.3d 81, 85-86 (1st Cir. 2004).

Because PURPA does not allow Allco to bring a federal claim against National Grid to enforce the PURPA regulations, National Grid's motion to dismiss Count III of Allco's complaint is **ALLOWED**.[6]

## II.   Allco's Motion for Summary Judgment

### A.   Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate "that there is an absence of evidence to support the nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657,

---

[6]    Accordingly, this Court does not reach National Grid's alternative argument that this Court should abstain from hearing Allco's claim for damages under the Colorado River doctrine. See Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976).

661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once such a showing is made, the burden shifts to the nonmoving party, who must, with respect to each issue on which it would bear the burden of proof at trial, come forward with facts that demonstrate a genuine issue. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citing Celotex, 477 U.S. at 324); Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 152-53 (1st Cir. 2009).

"A genuine issue exists where a reasonable jury could resolve the point in favor of the nonmoving party." Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009). "A party cannot survive summary judgment simply by articulating conclusions the jury might imaginably reach; it must point to evidence that would support those conclusions." Packgen v. BP Expl., Inc., 754 F.3d 61, 67 (1st Cir. 2014). A material fact is "one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

In its review of the evidence, this Court must examine the facts in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor, to "determine if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Sands, 212 F.3d at 661. The Court must ignore "conclusory allegations, improbable

inferences, and unsupported speculation" at the summary judgment
stage. Chiang v. Verizon New England Inc., 595 F.3d 26, 30 (1st
Cir. 2010). "Ultimately, credibility determinations, the
weighing of the evidence, and the drawing of legitimate
inferences from the facts are jury functions, not those of a
judge." Sensing, 575 F.3d at 163 (quoting Reeves v. Sanderson
Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

    **B.    Invalidity of the MDPU Rule**

    Allco argues that the MDPU rule is invalid because it
conflicts with FERC's regulations implementing PURPA. This is a
question of law and the relevant facts are not in dispute. This
court agrees with Allco and concludes that the MDPU rule is
invalid.

    Although Allco labels this argument a "preemption claim,"
this claim is better understood as an enforcement action against
the state defendants under 16 U.S.C. § 824a-3(h)(2)(B) for
failure to properly implement FERC's PURPA regulations. See
Allco Fin. Ltd. v. Klee, 805 F.3d 89, 95–98 (2d Cir. 2015);
Niagara Mohawk Power Corp. v. FERC, 306 F.3d 1264, 1270 (2d Cir.
2002).

    The MDPU regulation specifies that QFs with a design
capacity of one megawatt or greater, including Allco's solar
projects, "shall have their output metered and purchased at
rates equal to the payments received by the [utility] from the

ISO power exchange for such output for the hours in which the [QF] generated electricity in excess of its requirements." 220 Mass. Code Regs. § 8.05(2)(a). In other words, the only standard contract rate available to such QFs is the spot market price for wholesale energy.

Allco contends that because the spot market rate fluctuates hourly with market conditions and cannot be determined in advance of the actual delivery of electricity, the rate is necessarily "calculated at the time of delivery." 18 C.F.R. § 292.304(d)(2)(i). But under FERC's regulations, if a QF chooses to provide electric energy pursuant to a "legally enforceable obligation," the QF must have the option to receive the avoided costs "calculated at the time of delivery" or "calculated at the time the obligation is incurred." Id. § 292.304(d)(2). The MDPU rule, by providing only the spot market rate, eliminates the QF's ability to choose the latter pricing option. As such, the MDPU rule fails to properly implement FERC's regulations, as mandated by PURPA section 210(f)(1). 16 U.S.C. § 824a-3(f)(1).

The MDPU responds with a strained reading of the FERC regulations. Under 18 C.F.R. § 292.304(d), sales from QFs to utilities can be made on either an "as available" basis or "pursuant to a legally enforceable obligation." If the sale is made on an "as available basis," the avoided cost rate is

17

calculated at the time of delivery. If the sale is made "pursuant to a legally enforceable obligation," the QF has the option to choose whether to have the avoided cost calculated at the time of delivery or at the time the obligation is incurred. The MDPU's argument is that the initial choice of whether the sale is "as available" or "pursuant to a legally enforceable obligation" belongs to the state regulatory authority, and that because the MDPU has chosen for sales to occur on only an "as available basis," the only rate to which Allco is entitled is the avoided cost calculated at the time of delivery.

The plain language of the FERC regulations clearly state otherwise. The regulations provide that "[e]ach qualifying facility shall have the option either" to sell on an as available basis or pursuant to a legally enforceable obligation. 18 C.F.R. § 292.304(d). Under no reasonable reading of that language does that option belong to the state regulatory authority rather than to the QF.

The MDPU points out, correctly, that it is entitled to some deference on its interpretation of the FERC regulations. See Exelon Wind, 766 F.3d at 394 ("We review the [state commission's] implementation of PURPA and the FERC Regulation with deference because 'a state has broad authority to implement PURPA with respect to the approval of purchase contracts between utilities and QFs.'" (quoting Power Res. Grp., 422 F.3d at

18

236)). But whatever latitude the MDPU is given to implement FERC's PURPA rules does not justify an implementation that plainly conflicts with those rules. "A state's ongoing obligation under [PURPA section 210(f)] to 'implement' PURPA regulations can be accomplished in a variety of ways, but, at a minimum, [section 210(f)] undoubtedly prevents states from violating [section 210(a)]." Allco Fin. Ltd., 805 F.3d at 97.

The MDPU points to language in Exelon Wind that it claims supports its reading of the FERC regulation. In Exelon Wind, a wind power generation QF challenged a Texas regulation that allowed only QFs providing "firm" (as in, guaranteed) power to enter into legally enforceable obligations over a specified term. 766 F.3d at 385. The Fifth Circuit held that state regulatory agencies "were empowered to define the parameters of the circumstances in which Qualified Facilities could form Legally Enforceable Obligations." Id. at 396. Therefore, it held that the state agency "had the discretion to determine the specific parameters for when a wind farm can form a Legally Enforceable Obligation." Id.

The court rejected the argument raised by the wind farm that every QF must have the choice under 18 C.F.R. § 292.304(d)(2) to form a legally enforceable obligation. The court reasoned that if every QF were able to enter into a legally enforceable obligation, it would render superfluous the

19

provision allowing QFs to sell power on an as-available basis. Id. at 399. As such, the court reasoned, it made sense that the legally enforceable obligation was available only to the subset of QFs that provide firm power. The MDPU claims that, for that same reason of avoiding superfluity, it makes sense for the option of a legally enforceable obligation to belong to the state rather than to QFs.

As the dissent in Exelon Wind points out, the as-available sale provision governs a situation in which a legally enforceable obligation is, for whatever reason, not practically available. Id. at 412 (Prado, J., dissenting). Additionally, a QF that values flexibility and is willing to keep both upside and downside risks may choose an as-available sale even if a legally enforceable obligation is an option.

Even if the Exelon Wind majority were correct about superfluity, this case is distinguishable because the MDPU regulation prevents any QF from having the option under 18 C.F.R. § 292.304(d)(2)(ii), and that is inconsistent with the plain meaning of the rule. See Exelon Wind, 766 F.3d at 395 (noting that "the plain language of [the state rule] does not conflict with FERC's Regulation").

The MDPU also argues that the MDPU regulations effectuate congressional intent behind PURPA by avoiding locking utilities into above-market rates to the detriment of Massachusetts

consumers. The MDPU argues that, years ago, avoided costs might have been reasonably ascertainable over the life of a long-term contract because utilities tended to own generation resources and so the utility itself incurred the generation and construction costs. But, the MDPU argues, a shift in the electricity industry toward a competitive wholesale market since PURPA was enacted makes forecasting of avoided costs more indeterminate.

But FERC has stated that the purposes behind PURPA are furthered by allowing a QF to establish a fixed contract price for its energy and capacity at the outset of its obligation. A fixed contract price provides a potential investor in a QF with reasonable certainty about the expected return on a potential investment. JD Wind 1, LLC, 130 FERC ¶ 61,127, 61,631 (Feb. 19, 2010); see also Small Power Production and Cogeneration Facilities, 45 Fed. Reg. 12,214, 12,218 (Feb. 25, 1980). As such, FERC has "consistently affirmed the right of QFs to long-term avoided cost contracts or other legally enforceable obligations with rates determined at the time the obligation is incurred, even if the avoided costs at the time of delivery ultimately differ from those calculated at the time the obligation is originally incurred." JD Wind 1, 130 FERC at ¶ 61,631. FERC's rationale is that "in the long run, 'overestimations' and 'underestimations' of avoided costs will

balance out." Small Power Production and Cogeneration
Facilities, 45 Fed. Reg. at 12,224. Even under the MDPU's view
that the electric industry has shifted to a competitive
wholesale energy market, the utility making a purchase under a
long-term forecasted rate bears the risk that prices will drop
in the future and the QF bears the corresponding risk that
prices will rise.

One additional argument for the validity of the MDPU
regulations, made by National Grid, can be easily dispensed
with. National Grid argues that the P-Rate Tariff that National
Grid offered to Allco actually satisfied the requirement that
National Grid purchase from Allco pursuant to a legally
enforceable obligation with the rate calculated at the time the
obligation is incurred. National Grid argues that because the P-
Rate Tariff can only be terminated on thirty days of written
notice, it has a minimum specified term of thirty days. National
Grid further argues that the spot market rate is a "reasonable
and fair proxy" for its avoided costs for that thirty-day
period.

Even supposing that a rolling thirty-day term meets the
FERC regulation's requirement of a "specified term" for the
legally enforceable obligation -- an issue this Court does not
decide -- the P-Rate Tariff fails to comply with FERC
regulations. That is because even for a specified term of a

thirty-day period, an hourly market rate does not allow calculation of avoided costs at the time the obligation is incurred. See 18 C.F.R. § 292.304(d)(2)(ii).

In sum, the MDPU regulations at issue in this case are inconsistent with the plain language of the FERC regulations. As such, this Court holds that the MDPU regulations are invalid.[7] Allco's motion for summary judgment as to Count II is **ALLOWED**.

Allco requests that this Court engage in factfinding to determine the proper avoided cost rate. Nothing in the statutory scheme provides this Court with rate-making authority, and it lacks the expertise to do so. Rather, the MDPU has the statutory authority to revisit its implementation of FERC's rules, either through a new rulemaking, a case-by-case adjudication, or other reasonable method. See FERC, 456 U.S. at 751.

### ORDER

National Grid's motion to dismiss Count III of the complaint (Docket No. 27) is **ALLOWED**. Allco's motion for summary judgment (Docket No. 50) is **DENIED** as to Count III and **ALLOWED** as to Count II. The state defendants' cross-motion for judgment on the pleadings on Count II (Docket No. 63) is **DENIED**.

---

[7]    This Court does not reach Allco's arguments that the MDPU rule is invalid because it regulates wholesale electricity sales but does not foster QF generation or because the MDPU prohibits National Grid from passing through in retail rates its payments to QFs based on a long-term avoided cost rate.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge